Argued and submitted February 11, reversed
and remanded for trial May 26,
reconsideration denied August 13,
petition for review denied September 22, 1981 (291 Or 662)

# STATE OF OREGON,
## *Appellant,*

*v.*

# RAYMOND CHESTER HANNA, JR.,
## *Respondent.*

## (No. 10-79-11427, CA 19220)

628 P2d 1246

Frederick A. Hugi, Assistant District Attorney, Eugene, argued the caue for appellant. With him on the brief was J. Pat Horton, District Attorney, Eugene.

Thomas J. Crabtree, Deputy Public Defender, Salem, argued the cause for respondent. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

The state appeals a trial court order allowing defendant's motion to suppress. The issue is: Did a police officer "stop" defendant within the meaning of ORS 131.615,[1] and, if so, did the officer have reasonable suspicion to believe defendant had committed a crime to justify making such stop?[2]

Defendant was indicted for burglary of a pharmacy. The essential facts are as follows: At 4:20 a.m. on November 10, 1979, an alarm alerted the police to a burglary in progress. Officer Avalos, who was at the scene within minutes, apprehended one suspect and saw what he believed was another male coming out of the pharmacy and fleeing from the area. The suspect in custody admitted his involvement in the burglary. Officer Brooks arrived on the scene a few minutes later. Hearing from Avalos about another possible burglar, he began searching the area. Officer Brooks observed a van leaving a nearby parking lot. He watched the van drive through the intersection twice at a slow rate of speed and decided to investigate further. He drove in his patrol car in the direction the van had taken, but did not locate it.

### THE FIRST ENCOUNTER

At 4:44 a.m., as Officer Brooks was looking for the van six blocks from the scene of the burglary, he observed defendant walking toward him. There was no evidence defendant was in any way connected with the van Brooks was searching for. As defendant approached, Officer Brooks stepped from his patrol car and asked to speak with

---

[1] ORS 131.605(5) provides:

"A 'stop' is temporary restraint of a person's liberty by a peace officer lawfully present in any place."

ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry."

[2] In its trial brief, the state contended the "stop" was justified. At the suppression hearing, the state argued the initial contact between the defendant and Officer Brooks did not amount to a "stop," but was mere conversation. While expressing surprise at this obvious inconsistency, defense counsel advised the trial court he was nevertheless prepared to proceed, whatever the state's theory of the case.

him. Defendant stopped. Officer Brooks told him about the burglary, asked him for some identification and inquired as to who he was and what he was doing. Defendant gave his name and address and answered Brooks' questions. In the course of this conversation, he produced an Oregon I.D. card and volunteered that his current address, the one he had given orally, was different from the address on his I.D. card. Officer Brooks took defendant's I.D. card to his patrol car to check for warrants and radioed Avalos, who asked the suspect in custody if he knew defendant. When the suspect denied knowing him, defendant's I.D. card was returned and defendant proceeded on his way. No physical contact occurred between Brooks and the defendant during their conversation. Brooks continued his search for the van.

### THE SECOND ENCOUNTER

Moments later, Officer Brooks heard Avalos reporting the name and address of the suspect in custody over his radio. Brooks realized that the address given by Avalos for the suspect in custody was the same as that given orally by defendant. Brooks quickly drove about a block, stopped defendant and frisked him for weapons. During this frisk Brooks found a two-way radio, which was the subject of the motion to suppress. Brooks conferred with Avalos, who reported he had found a similar two-way radio on the suspect in custody. At this time Officer Brooks arrested defendant for burglary.

The trial court made the following findings:

"1. There was not a frisk on the first stop by Officer Brooks; the defendant's testimony is inaccurate and the police officer's testimony is accurate in that respect.

"2. The defendant gave some physical identification to Officer Brooks, Officer Brooks had the physical identification in the patrol car and that is part of the basis that the Court has for believing that a stop was made.

"3. Officer Avalos told Officer Brooks that he saw what he thought to be a male figure fleeing the scene.

"4. There was a stop rather than a mere interrogation.

"5. Applying the rule of *State v. Fitzgerald,* 36 Or App 473 (1978) to the facts of this case; there was not reasonable suspicion to stop the defendant;

"* * * * *"

The trial court based its decision on *State v. Fitzgerald,* 36 Or App 473, 584 P2d 785 (1978). In *Fitzgerald,* a police officer heard about a burglary in progress. He proceeded to the area and noticed a truck approaching from the general direction of the burglary. Activating his overhead lights, he stopped the truck. Fitzgerald was detained for about 20 minutes while another officer was dispatched to bring the burglary victim to view and perhaps identify him. Fitzgerald was required to put on his glasses and a jacket found in the vehicle by the police. Before Fitzgerald was given the jacket to wear, the police searched its pockets and removed a tool which was the subject of the motion to suppress. The trial court ruled the encounter was a valid stop and the evidence was admissible. We held the officer did not have observable facts giving rise to an inference that Fitzgerald had committed a crime and therefore the stop was not sanctioned by ORS 131.615. *Fitzgerald* clearly involved a "stop," and no one suggested otherwise. The threshold question here, however, is did Officer Brooks "stop" defendant.

There are three generally recognized types of street encounters between police and citizens: (1) an arrest based upon probable cause; (2) a "stop," i.e., temporary restraint of a person's liberty by a police officer which is justified by reasonable suspicion that the person has committed a crime; and (3) questioning without restraint of liberty i.e., mere conversation, which requires no justification. *State v. Kennedy,* 290 Or 493, 497, 624 P2d 99 (1981); *State v. Warner,* 284 Or 147, 161, 585 P2d 681 (1978).[3]

---

[3]   "* * * Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation. Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime.

"* * * * *

"* * * No judicial opinion can comprehend the protean variety of the street encounter, and we can only judge the facts of the case before us. Nothing we say today is to be taken as indicating approval of police conduct outside the legitimate investigative sphere. Under our decision, courts still

■ In determining whether an encounter is a "stop," we must ask whether the person encountered could refuse to cooperate and walk away.[4] *State v. Canape,* 46 Or App 453, 457, 611 P2d 1190 (1980). The totality of the facts must be examined in each case to determine whether a "stop" has occurred. *State v. Kennedy, supra,* at 498.

■ Here, the defendant was approaching a single officer on a well-lighted public street. When Officer Brooks encountered defendant, he asked: "Can I speak to you for a moment, please?" and waited for defendant to approach the police vehicle. Defendant was not required to alter his course to comply with Brooks' invitation. No physical restraint was involved, and no physical contact between the men occurred. Brooks said nothing to indicate defendant was the burglary suspect Brooks was seeking. In response to a polite verbal request for identification, defendant voluntarily and in a spirit of apparent cooperation gave his name and current address and identification card, and even volunteered the fact that there was a discrepency between the address he gave and the one on his I.D. card, when there was nothing to connect him with his current address. The officer promptly ran a record check and conferred with his

retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials. And, of course, our approval of legitimate and restrained investigative conduct undertaken on the basis of ample factual justification should in no way discourage the employment of other remedies than the exclusionary rule to curtail abuses for which that sanction may prove inappropriate."

*Terry v. Ohio,* 392 US 1, 13, 15, 88 S Ct 1868, 20 L Ed 2d 889 (1968).

[4] Not all encounters between policemen and citizens involve seizures of the person. There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the street. Police officers enjoy the liberty enjoyed by every citizen to address questions to other persons, although ordinarily the person addressed has an equal right to ignore his interrogator and walk away. It is only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen that a seizure has occurred. A person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave. *Reid v. Georgia,* 448 US 438, 100 S Ct 2752, 65 L Ed 2d 890 (1980); *United States v. Mendenhall,* 446 US 544, 100 S Ct 1870, 64 L Ed 2d 497 (1980); *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968); *Sibron v. New York,* 392 US 40, 88 S Ct 1889, 20 L Ed 2d 917 (1968); *State v. Reid,* 247 Ga 445, 276 SE2d 617 (1981).

colleague[5] and, finding nothing of interest, returned defendant's I.D. card and immediately terminated the conversation. The entire episode consumed only a few minutes. These facts strongly suggest to us that the defendant was voluntarily cooperating with Officer Brooks and that he was free to walk away if he chose.

Defendant argues that, while he was not under physical restraint, he was not free to leave and did not answer Officer Brooks' questions voluntarily. While it is true that restraint may rise from a police dominated atmosphere, *State v. Evans,* 16 Or App 189, 196, 517 P2d 1225, *rev den* (1974),[6] the evidence here falls short of any such environment.

We need not reach the question of whether Officer Brooks had reasonable suspicion to believe defendant had committed a crime, because we find that during an encounter that was not a "stop" within the meaning of ORS 131.615, defendant volunteered the information which led to his eventual arrest. This first encounter between Officer Brooks and the defendant constituted mere conversation which required no justification. *State v. Warner, supra; State v. Evans, supra.*

The information voluntarily given by defendant during this conversation is what later connected him with the suspect in custody and what led to the discovery of the incriminating evidence he is now seeking to suppress. That evidence was seized by Officer Brooks during a second encounter, the nature and validity of which is not before us.

Reversed and remanded for trial.

---

[5] Assuming *arguendo* that when Officer Brooks took defendant's I.D. card to his patrol car to check for warrants that the encounter changed from mere conversation to a "stop," the fact remains that defendant had already given Officer Brooks his name and current address and that information is what later connected defendant with the suspect in custody rather than anything said or done during any such "stop."

[6] Not every preliminary inquiry of a person by a policeman is a "stop." *State v. Canape,* 46 Or App 453, 457, 611 P2d 1190 (1980). The test is an objective one to be determined by the totality of the evidence. *State v. Kennedy,* 290 Or 493, 498, 624 P2d 99 (1981); *State v. Warner,* 284 Or 147, 161, 585 P2d 681 (1978).