Argued and submitted December 16, 2010, affirmed February 15, petition for review denied May 31, 2012 (352 Or 76)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**JACOB CHARLES LEINO,**
aka Jacob C. Leino,
*Defendant-Appellant.*

Multnomah County Circuit Court
080733445; A141398

273 P3d 228

Ernest G. Lannet, Senior Deputy Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Erika L. Hadlock, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.*

BREWER, C. J.

---

* Brewer, C. J., *vice* Rosenblum, S. J.

**BREWER, C. J.**

Defendant appeals his convictions for unlawful possession of cocaine, ORS 475.884, and unlawful possession of methamphetamine, ORS 475.894. He assigns error to the denial of his motion to suppress. He argues that the police officer's observations leading to the search that produced evidence of drugs were made during an unlawful extension of an initially lawful traffic stop. We review the trial court's denial of the motion to suppress for errors of law. *State v. Chambers*, 226 Or App 363, 365, 203 P3d 337 (2009). We conclude that the stop was not unlawfully extended, and therefore affirm.

The pertinent facts are not in dispute. Around 3:00 a.m. on July 3, 2008, Portland Police Officer Thurman observed defendant riding a bicycle without a headlight, a traffic violation under ORS 815.280(2)(c). Defendant rode the bicycle into a garage, and Thurman called to defendant from the street to come and talk to Thurman. Thurman told defendant the reason for the stop and asked for his identification, and defendant handed him his Oregon driver's license. Thurman proceeded to call in defendant's identifying information to the police dispatch. While Thurman was speaking with the dispatcher, he noticed that defendant was fidgety and asked defendant to keep his hands in view. Defendant raised his hands, and, at that point, Thurman observed that defendant was carrying a knife clipped to the front pocket of his pants. Thurman asked if he could search defendant, and defendant consented to a search, which revealed drugs in addition to the knife. At around the time Thurman was conducting the search, dispatch responded that defendant was "clear and valid."

Defendant moved to suppress the knife, the drugs, and incriminating statements that he made after he was arrested, arguing that he was stopped in violation of Article I, section 9, of the Oregon Constitution, because he had been unlawfully detained before Thurman saw the knife, when Thurman had called dispatch.[1] At the suppression hearing,

---

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

Thurman testified that he had taken defendant's identification "to issue a citation, essentially. As he did give me the [identification] then, of course, I ran his information through our service net." When asked if he was running defendant's name through the system for a "records check," Thurman replied that he was. He indicated that it was "standard procedure" to check a person for warrants in the course of a traffic stop. Defendant argued that, after he had provided Thurman with his identification, Thurman had all the information he needed to issue defendant a citation for the bicycle violation, and that he impermissibly extended the stop by calling defendant's identification in to the dispatcher. The trial court, relying on *State v. Smith*, 73 Or App 287, 292, 298 P2d 973 (1985), concluded that "the request for consent was conducted during an unavoidable lull; that is, the warrant check that the officer was conducting," and denied defendant's motion to suppress. Defendant was then tried to the court on stipulated facts, reserving the right to appeal, and he was convicted.

On appeal, defendant argues that Thurman ran his information to check for outstanding warrants, which he contends was not reasonably necessary to the investigation of a routine, bicycle-related, traffic violation. Conducting a warrant check, according to defendant, was equivalent to a criminal investigation without reasonable suspicion, and thus unlawfully extended the duration of the stop. Defendant argues that Thurman's request for consent and subsequent search of defendant's person occurred while that unlawful stop was ongoing. Therefore, he contends, the trial court erred in denying his motion to suppress.

As pertinent here, the state replies that an officer does not impermissibly extend a traffic stop by conducting a records and warrant check, because a records check can establish whether the identification provided to the officer is valid. The state further notes that there is no evidence that the performance of a "warrant check" at the same time as the "records check" takes any additional time and, thus, even assuming that checking for warrants alone might impermissibly extend a stop, a "records check" does not. The state relies on numerous cases from this court that indicate, at

least implicitly, that records and warrant checks are permissible in the course of a traffic stop.

As an initial matter, we agree with the state that the proper framing of the issue is whether a records check that includes a warrant check impermissibly extends a stop. As noted, the evidence showed that it was standard procedure for Thurman to run a "records check" and a "warrant check" before issuing a traffic citation.[2] Thus, to the extent that defendant is suggesting that, by calling defendant's information in to the "service net," Thurman began an impermissible "criminal investigation [into] whether defendant was a fugitive from justice," we do not agree that the record establishes that that was what Thurman was doing. Rather, the record reflects that Thurman followed a standard procedure that involves performing a records and warrant check whenever a traffic citation is issued. Thus, the issue is whether, in the course of investigating a bicycle traffic violation, the officer unlawfully extended the stop by running such a check on defendant before issuing the citation.

As the state notes, on numerous occasions we have indicated that running a records or warrant check *is* permissible in the course of a traffic stop. As explained below, although much of our case law is implicit rather than explicit on this point, we agree with the state that conducting such a check before issuing a citation did not impermissibly extend or expand the scope of the stop in this case.

Under Article I, section 9,

"[p]olice authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, *viz.*, a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be justified on some basis other than the traffic violation."

---

[2] We note that the record does not establish precisely what that process entails, other than the officer calling the stopped person's identifying information in to a "service net," and, as in this case, receiving a response of "clear" and "valid."

*State v. Rodgers/Kirkeby*, 347 Or 610, 623, 227 P3d 695 (2010). As we concluded in *State v. Amaya*, 176 Or App 35, 47, 29 P3d 1177 (2001), *aff'd on other grounds*, 336 Or 616, 89 P3d 1163 (2004), Article I, section 9, also is not implicated if an inquiry unrelated to a traffic stop occurs during a routine stop but does not delay it, that is, if it occurs during an "unavoidable lull" in the investigation. Thus, for example, questioning that transforms an encounter from a routine traffic stop into a criminal investigation is not unlawful if it occurs while an officer is lawfully and expeditiously conducting the traffic stop, and it does not result in an extension of that initial stop. *State v. Gomes*, 236 Or App 364, 372, 236 P3d 841 (2010). Accordingly, the precise question in this case is whether Thurman observed defendant's knife in the course of lawfully conducting the stop for a bicycle traffic violation while calling defendant's identifying information in to the dispatcher, or whether, as defendant contends, calling in defendant's identifying information to the dispatcher was not "reasonably related to that traffic violation, the identification of persons, and the issuance of a citation." *Rodgers/Kirkeby*, 347 Or at 623.

Operating a bicycle without a light in the circumstances at issue in this case is a traffic violation, ORS 815.280, and a police officer "[m]ay stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation." ORS 810.410(3)(b); *accord Rodgers/Kirkeby*, 347 Or at 623 (identifying scope of lawful traffic stop accordingly). In addition, we note that *Rodgers/Kirkeby* itself provides strong support for the conclusion that this type of check is permissibly within the scope of a traffic stop. There, the defendant Rogers had been stopped for a traffic violation and had provided the officer with his license and registration, but was unable to provide proof of insurance. 347 Or at 613. The officer had "returned to his patrol car and radioed a request for a records check," which "had come back clear, and [the officer] therefore had a sufficient basis only to issue defendant a traffic citation." *Id.* at 614. Rather than issue the citation, however, the officer questioned the defendant about items in the vehicle. The court concluded that the stop had been unlawfully extended because, when the officer

"returned to defendant's driver-side window, he had all the information necessary to issue defendant a citation and end defendant's limited detention." *Id.* at 626. At that point, the officer "had completed the investigation reasonably related to the traffic infraction and issuance of the citation." *Id.* Implicit in the court's conclusion is that, *before* that point, the stop was lawful. That is, the stop became unlawful after the officer had run the check and it had "come back clear." *Id.* at 614.

Additionally, in numerous cases, we have indicated that an officer's action in contacting dispatch with a defendant's identifying information is within the scope of a lawful traffic stop. *See, e.g., State v. Hampton,* 247 Or App 147, 153 n 5, 268 P3d 711 (2011) (explicitly rejecting argument that officer unlawfully extended a stop by asking for the defendant's registration, noting that "asking a defendant for his license, registration, and insurance is routine behavior for an officer conducting a traffic stop"); *State v. Klein,* 234 Or App 523, 531, 228 P3d 714 (2010) (officer "had the information that he needed to conclude the traffic stop when he returned to speak with defendant after completing the warrant check"); *State v. Amador,* 230 Or App 1, 8, 213 P3d 846 (2009), *rev den,* 347 Or 533 (2010) (officer's question about drugs and weapons did not impermissibly expand scope of traffic stop because "the officer had only just obtained defendant's identification and thus did not yet have all the information necessary to issue a citation"); *State v. Huggett,* 228 Or App 569, 574-75, 209 P3d 385 (2009), *rev dismissed,* 348 Or 71 (2010) ("Nothing in the record indicates that, at the time [the officer] requested defendant's consent to search his person, he was awaiting the results of a records check, was waiting for defendant to provide him with items needed to continue the traffic stop, or was engaging in any other step related to the investigation of the traffic offense or the issuance of a citation for that offense."); *Smith,* 73 Or App at 292 (a check "to confirm identification and to check for outstanding warrants is a procedure that commonly accompanies traffic stops" and does not exceed the lawful basis for the stop); *State v. Perry,* 39 Or App 37, 42, 591 P2d 379 (1979) (after officer "had a check by radio and discovered no criminal record of any outstanding process for defendant, further detention of defendant and his family was not justified").

To the extent that defendant suggests that, even if a "records" check is permissible, a "warrant" check is not, we disagree that any such distinction is possible on this record. Neither the parties nor the trial court drew any legal distinction between a records check and a warrant check. Nor have we or the Supreme Court done so in any previous decision. Moreover, the record does not establish a factual basis for any such distinction. The trial court specifically found, and the record supports the finding, that the officer "asked the defendant for identification to issue a citation," and he received a response from dispatch within a very few minutes. There is no indication that the dispatcher required additional time to check for "warrants." *Cf. Smith*, 73 Or App at 292 ("A warrant check may become unreasonable under ORS 131.615(2) if, for instance, it takes an inordinately long time to complete."). Thus, this case affords us no occasion to decide whether a warrant check that significantly delays the issuance of a citation would impermissibly extend a lawful traffic stop.

Finally, we reject defendant's suggestion that, because this case involves the stop of a bicycle rather than a motor vehicle, no check of any sort was permissible. It is true that an officer stopping a motor vehicle may have more to check than the stopped person's identification; for example, the cases cited above generally indicate that a check in a motor vehicle stop involves a check of a vehicle's registration and insurance coverage. However, that does not change the nature of the inquiry under ORS 810.410 and Article I, section 9, concerning whether "the investigation reasonably [is] related to that traffic infraction, the identification of persons, and the issuance of a citation[.]" *Rodgers / Kirkeby*, 347 Or at 623.

We conclude that, in the course of a lawful traffic stop, an officer's act of contacting dispatch with a person's identifying information is reasonably related to the identification of the person and the issuance of the citation. Determining that a defendant is, in fact, the person he or she claims to be is reasonably related to the identification of the person and the issuance of the citation. *See, e.g., State v. Hebrard*, 244 Or App 594, 596, 260 P3d 759 (2011) (officer who called in a defendant's name and date of birth to

dispatch received a response of "unable to locate"); *State v. Backstrand*, 231 Or App 621, 624, 220 P3d 748 (2009) (officer called dispatch "in order to ensure that the identification cards were genuine," explaining, "[w]hen somebody has a fake ID, if we run it, it comes back unable to locate."); *State v. Chrisco*, 223 Or App 380, 383, 196 P3d 10 (2008) (dispatch informed officer that the defendant gave a date of birth that did not match the date of birth of the name given).

In sum, the trial court correctly concluded that the officer's act of contacting dispatch with identifying information about defendant, who was lawfully stopped, was permissibly related to "the identification of [a person] and the issuance of a citation." *Rodgers/Kirkeby*, 347 Or at 623.

Affirmed.